R & R ASSOCIATES et al.

v.

CITY OF PROVIDENCE WATER
SUPPLY BOARD et al.

v.

State of Rhode Island.

No. 99–153–Appeal.

Supreme Court of Rhode Island.

Jan. 23, 2001.

Robert D. Wieck, Kenneth P. Borden, Thomas H. Quinn, Jr., Bruce R. Ruttenberg, Peter J. Cerilli, Stephen A. Rodio, Rebecca Tedford Partington, Denean M. Russo, Providence, for Plaintiff.

Ronald W. DelSesto, Linda Elizabeth Buffardi, Providence, for Defendant.

Present WEISBERGER, C.J., LEDERBERG, BOURCIER, FLANDERS, and GOLDBERG, JJ.

## OPINION

FLANDERS, Justice.

The fountainhead for deciding this case springs from the statutory and contractual origins of the Scituate Reservoir, a primary source of water for many Rhode Islanders. The Superior Court certified the plaintiffs, L & L Associates and its general partner, Robert LaFerriere, to represent a class of plaintiffs who constituted the "present-day successors in interest to the land and water rights that in 1922 were appurtenant to" nine separate mill sites that were owned by the Hope Company, B.B. & R. Knight, Inc., and Interlaken Mills (the mills). All of the mill sites abutted the north branch of the Pawtuxet River.

The plaintiffs have appealed to this Court from a Superior Court judgment in favor of defendants, the City of Providence (city) and the City of Providence Water Supply Board (board). The trial court declared that they neither breached a contract with the mills nor took their residual water and property rights without just compensation. The judgment also dismissed the remaining four counts of the complaint. The plaintiffs contend that the trial justice erred in his statutory interpretation of the original 1915 enabling act and in his construction of a 1922 contract between plaintiffs' predecessor and the board. The defendants have cross-appealed, challenging the trial justice's decision to exclude certain evidence.

Recently, we mapped this parting of the waters in the course of navigating a tributary of this case. *See R & R Associates v. City of Providence Water Supply Board,* 724 A.2d 432 (R.I.1999) (*R & R Associates I* ). Thus, we will not replot it here, except as needed to chart the issues raised by this appeal. Suffice it to say that the statutory and contractual stream of events leading to the creation and maintenance of the Scituate Reservoir is the wellspring for this dispute. In 1915 the General Assembly enacted P.L.1915, ch. 1278 (the 1915 act),

which allowed the city "to condemn lands and water in and around the north branch of the Pawtuxet River in order to form the [Scituate] reservoir." *Id.* at 433. In addition to the city, other municipalities, including Scituate, Cranston, parts of Warwick, and communities along the Pawtuxet River were also allowed to receive water from the reservoir under the 1915 act. *Id.* Eventually the city condemned 12,546.88 acres and the water rights of downstream landowners. *Id.*

In 1922, the city contracted with the mills that were located downstream from the reservoir to compensate them for taking their riparian rights.[1] *Id.* at 434. The named plaintiffs are the successors in interest to one such mill, the Hope Company. Under Article 1 of the 1922 contract:

"The Mills will * * * each release unto the City all its claims for damages recoverable in the condemnation proceedings * * * under the provisions of said Chapter 1278 of the Public Laws for the taking of its waters, water rights and privileges * * * and for any other damages direct or consequential secured to it under said Chapter * * * excepting and providing, however, that each Mill does hereby reserve and except and will reserve and except in its said release * * * (b) all its claims, rights and remedies now or hereafter accruing under the provisions of Section 6 of said Chapter 1278, in so far as they relate to the waters and water rights excepted from condemnation or reserved or guaranteed to the Mills, or condemned subject to such rights and guaranties, or in so far as they relate to the regulation and use of all such waters and water rights; (c) any future damages to which it may

become entitled under the provisions of the next to last paragraph of said Section 6 * * * ."[2]

In short, the 1922 contract compensated the mills for taking most of their water flow, but it also specified that it would not impair any residual water rights of the mills under section 6 of the 1915 act. Indeed, Article 16 of the contract provided that all rights enjoyed by the mills under the 1915 act would remain in force. Notwithstanding the substantial monetary compensation provided to the various mills under the 1922 contract,[3] plaintiffs contend that the above contractual language demonstrated that the mills retained certain additional water rights beyond those that the city had condemned and for which it had compensated them. They further suggest that, over the years, these residual water rights have been taken from them without paying them any additional compensation. This occurred, they maintain, whenever the General Assembly, the city, and/or the board allowed additional communities to use the Scituate Reservoir water without paying the mills any additional compensation. They further contend that, as successors in interest to the mills and their owners, they are entitled to additional compensation for these purloined water rights. They point to section 6 of the 1915 act as providing them with so-called "surplus water" rights based upon the act's requirement that water not used for the municipal water supply "shall be discharged into said branch above the dam of the Hope Mills, so-called, in the [T]own of Scituate * * * ."

Over the years the General Assembly amended the 1915 act several times to allow additional communities in the state

---

1. Ever since this Court's decision in *Richmond Manufacturing Co. v. Atlantic DeLaine Co.*, 10 R.I. 106, 111 (1871), we have recognized a riparian proprietor's right to the reasonable use of the waters of a river or stream.

2. The above subsection (c) in Article 1 of the 1922 contract referred to compensation for any pollution in the construction process which might have caused damage to the mills'

manufacturing. It does not refer to any water rights of the mills, per se.

3. Article 1 of the contract specified that the Hope Company was paid $394,407 (in 1922 dollars) as settlement for the condemnation of its water rights. It is undisputed that these compensatory amounts were paid in full.

to draw their water from the Scituate Reservoir. The board also sold water to other communities that were not named in the 1915 act and its several amendments. On January 5, 1996, plaintiffs filed the present action, alleging that "the City of Providence and the Providence Water Supply Board, by supplying water to communities and water districts not originally included in the 1915 Act and not contemplated by the 1922 contract, effected an uncompensated taking of their residual riparian rights and breached the 1922 contract." *R & R Associates I*, 724 A.2d at 434. The first four counts of plaintiffs' complaint alleged takings and breach of contract claims. The fifth count requested a declaratory judgment. The defendants denied the allegations and impleaded several municipalities and water districts as third-party defendants. In due course, the court granted summary judgment in favor of the third-party defendants and this Court affirmed. *Id.* at 434, 436. We ruled that only the city and the board could be liable for any of plaintiffs' takings claims and that the third-party defendants could not be liable under the breach of contract claims because they were not parties to the 1922 contract. *Id.* at 436.

The case against the city and the board proceeded to a nonjury trial on the declaratory judgment count. After hearing testimony and receiving evidence, the court issued a decision in favor of the city and the board, concluding "that the defendants' sale of water to municipalities * * * does not constitute an unlawful taking, nor does it constitute a breach of the 1922 Contract." The court found that section 6 of the 1915 act did not confer upon the mills the right to be compensated for defendants' use of what might otherwise have qualified as surplus water. The trial justice found that if the Legislature had intended to confer upon the mills the right to take and receive any of the surplus water that was required to be discharged into the north branch of the Pawtuxet River above the mills, the act would have specifically provided plaintiffs with such a right. The

court further found that the act's inclusion of the underscored phrases "now supplied, or *hereafter supplied* * * * in the city of Cranston, the towns of North Providence, Johnston and Warwick, *or elsewhere*" in section 6 (emphases added) provided defendants with an open-ended right (subject to minimum-flow requirements) to supply water to other municipalities not named in the 1915 act. According to the trial justice, only the "paramount limitations" clause of section 6—requiring, among other things, a minimum level of water flowage at specified locations down river—placed some constraint on the amount of water that could be supplied to later-added Rhode Island communities under the act.

Finally, the Superior Court's decision examined the condemnation documents and the 1922 contract. The court found that the "Statement of Taking" in those documents demonstrated that in 1916 the city took all the water rights along the north branch of the Pawtuxet River, leaving no residual-water rights for plaintiffs except for enjoyment of a minimum flow of water. The only limits to the city's use of these water rights under the 1915 act were those placed in the paramount limitations clause, requiring, in essence, a certain minimum downstream water flow for the mills. In examining the 1922 contract, the court acknowledged that this clause preserved to the mills any water rights that were excepted from condemnation, but it concluded that the mills' only remaining rights pertained to minimum flowage for water discharged downstream. The court determined that no breach of contract occurred because plaintiffs were not claiming that the city had failed to comply with minimum-flowage requirements. As a result, judgment entered in favor of defendants, and plaintiffs appealed. In response, defendants filed a timely cross-appeal.

On appeal, plaintiffs argue that Article 1 of the 1922 contract clearly recognized that they retained certain water rights when it stated

"that each Mill does hereby reserve and except and will reserve and except in its said release * * * all its claims, rights and remedies now or hereafter accruing * * * under the provisions of Section 6 of said Chapter 1278, in so far as they relate to the waters and water rights excepted from condemnation or reserved or guaranteed to the Mills * * *."

The plaintiffs contend that section 6 required the discharge of water into the north branch above the Hope Mills and that Article 7 of the 1922 contract required certain minimum quantities discharged into the north branch. They argue that these provisions demonstrate that they were entitled to receive this water flow and that they maintained residual rights to these waters. They suggest that each time the city sold water to communities not listed in the original 1915 act, a *de facto* condemnation of their water rights occurred. This is so, they contend, because the city was required to discharge any water not used for supplying water to the named municipalities into the north branch. Similarly, they insist that the city's sale of water to additional communities not named in the 1915 act constituted a breach of the 1922 contract that guaranteed plaintiffs' rights to such surplus water.

The defendants respond by arguing that the "Statement of Taking" clearly indicates that the city took all of the water rights associated with the north branch of the Pawtuxet River, subject to maintaining the minimum-flow requirements. The 1922 contract, defendants posit, neither created new water rights nor did it alter existing water rights. They assert that the contract simply preserved plaintiffs' rights to a minimum water flowage. They contend that because plaintiffs retained no proprietary rights to the water itself, the city did not condemn plaintiffs' water rights when it sold the water to other communities. The defendants also suggest that plaintiffs are at best an incidental beneficiary to the flow of the Pawtuxet River water. They maintain that the words "hereafter sup-

plied" and "elsewhere" in the 1915 act allowed the city to sell the water to communities not listed originally in the 1915 act. Finally, in support of their cross-appeal, defendants urge that if this Court remands the case for a new trial, extrinsic evidence of the parties' intentions should be admissible in connection with the condemnation process and the 1922 contract. The Superior Court ruled that the extrinsic evidence offered by defendants was inadmissible because the statute and contractual documents were unambiguous. The defendants submit that if this Court concludes that the statute and documents are ambiguous, the excluded evidence concerning the parties' intentions should be admitted.

### Analysis

■ To resolve this appeal, we need to construe the applicable statutes and interpret the 1922 contract. In construing a statute, this Court's primary " 'task is to establish and effectuate the intent of the Legislature.' " *Cardarelli v. DET Board of Review,* 674 A.2d 398, 400 (R.I.1996). This intent is gleaned from a careful examination of the "language, nature and object of the statute." *Brouillette v. DET Board of Review,* 677 A.2d 1344, 1346 (R.I.1996) (quoting *D'Ambra v. North Providence School Committee,* 601 A.2d 1370, 1374 (R.I.1992)). "As the final arbiter on questions of statutory construction * * * 'this Court examines statutory provisions in their entirety, attributing to the act the meaning most consistent with the policies and purposes of the Legislature.' " *Commercial Union Insurance Co. v. Pelchat,* 727 A.2d 676, 681 (R.I.1999). "[I]ndividual sections must be considered in the context of the entire statutory scheme, not as if each section were independent of all other sections." *Sorenson v. Colibri Corp.,* 650 A.2d 125, 128 (R.I.1994).

■ Upon examining the pertinent statutory sections and the 1922 contract in this context, we are persuaded that the trial justice's decision correctly analyzed

and applied the provisions in question. Section 6 of the 1915 act furnished broad authority for the city "to acquire absolutely by condemnation, the waters of said branch of said river and its tributaries, or any part or parts thereof * * *." The words "hereafter supplied" and "elsewhere" in section 6 also authorized the city to sell water to other communities in addition to those mentioned in the original 1915 act. Although the 1922 contract preserved any remaining water rights for plaintiffs' predecessors, such rights were limited principally to the requirement that the city maintain a specific minimum flowage of water on the Pawtuxet River. No unconditional or guaranteed right to use or obtain any surplus water flow was provided to the mills in the 1915 act because defendants always retained the authority "hereafter" to supply that water "elsewhere" than to just the communities named in the act. Moreover, the speculative rate of any future population growth in the named geographic areas also served to reduce the possibility of any surplus water actually flowing past the mills' property to a mere contingency that the mills were not entitled to have relied upon as the equivalent of a contractual promise. Finally, although subject to plaintiffs' section 6 rights, the parties' "Statement of Taking" specified that the city took "*[a]ll the waters of said north branch of said Pawtuxet River and its tributaries * * * and any and all water and flowage rights and privileges* appurtenant to [adjacent lands]." (Emphases added .) In sum, the statutory obligation for defendants to discharge any surplus water into the north branch of the Pawtuxet River also allowed defendants to determine whether any such surplus would exist—especially as it would depend substantially on the uncertain volume of water that defendants might supply to both the named and "hereafter supplied" communities that could be located "elsewhere" from those specified in the act.

The extent of a condemnation is evidenced by the four corners of the condemnation documents. *Kentucky Fried Chicken of Warren, Inc. v. Flanders,* 461 A.2d 927, 928–29 (R.I.1983); *see also Sullivan v. Marcello,* 100 R.I. 241, 251, 214 A.2d 181, 186 (1965). The condemnation documents in this case show that after receiving substantial compensation for the water rights taken by the defendants, the mills only retained the benefit of certain minimum-flowage requirements imposed upon the city, but they did not retain any proprietary water rights that the defendants violated when they "hereafter supplied" water to communities that were located "elsewhere" than those named in the 1915 act—just as that act always had allowed them to do.

### Conclusion

Given our affirmance, we have no need to decide the defendants' cross-appeal. Thus, we deny the plaintiffs' appeal and affirm the Superior Court's judgment.